Good morning. May it please the Court, my name is Amy Candido and I represent Appellate Bally Gaming, Inc. As an initial matter, IGT criticizes Bally for not citing the recent KSR case in its briefs. But this appeal, unlike the IGT v. Alliance appeal to be heard next, does not concern whether it would be obvious to combine familiar elements according to Topsy-Turvy and the Telness patent disclose specific claim elements in the 916 patent and whether IGT met its burden of proof with respect to those elements, not whether it would have been obvious to combine Topsy-Turvy and Telness. In this case, at least, Bally and IGT agree that it would have been obvious to combine a Topsy-Turvy wheel game and Telness. Notably, IGT advances a contrary argument in the IGT v. Alliance appeal, but my colleague Mr. Verhoeven will address that in the next argument. In this case, the district court's grant of summary judgment of invalidity of the 916 patent should be reversed because first, IGT failed to show by clear and convincing evidence that Topsy-Turvy disclosed the predetermined result and segment detector elements. Second, the district court improperly relied on unsighted prior art that Bally had no opportunity to address. MR. EBERSTADT. Ms. Candido, I have a few questions, but before I start, I'm a little hesitant to ask any questions because so much has been marked confidential. Is there anything that I need to stay away from? MS. CANDIDO. From Bally's perspective MR. EBERSTADT. Like every other paragraph, there's something bracketed with confidential markings. MS. CANDIDO. Yes, Your Honor, and from Bally's perspective, there's no limits with respect to confidentiality. The information designated confidential is information that IGT designated, and when we met and conferred would not remove the confidentiality designation. MR. EBERSTADT. All right, we'll take that up then with IGT. MR. EBERSTADT. Well, could we perhaps get a quick clarification so I can ask a question? MR. KAYE. Well, I think, is there anyone here in the audience that you feel should not listen to and the questions that we might ask with respect to material that's been marked confidential as far as either of you is concerned? MR. KAYE. As far as we're concerned, everything is available both in the courtroom today and in the court's opinion. MR. KAYE. All right. MS. CANDIDO. Bally concurs on that. MR. KAYE. All right, thank you. Thank you very much. Why isn't it sufficient simply to look to the topsy-turvy device for simply what is disclosed in the photograph that's in the record and then rely on the Telne's patent for the rest of the teachings to establish obviousness? MS. CANDIDO. Well, there is no topsy-turvy game in existence, just to make that point clear. As you pointed out, there's only a photograph of the game. MR. KAYE. My point is, isn't it sufficient that there's that photograph that clearly shows segmented wheels? MS. CANDIDO. Well, with respect to the predetermined result element in Claims 21 and 22, topsy-turvy does not disclose a predetermined result. Topsy-turvy only had segments and there were four different wheels. And in order to determine the result, you had to consult all four wheels and the outcome on each of those wheels in combination would determine whether you won a prize. The predetermined result element in the 916 patent, as shown in the figure in the patent, has the results immediately visible to the player on the wheel. It says five tickets, for example. And the Telne's patent does not provide that missing element. MR. KAYE. So your position, let's see, is this what your position comes down to essentially is if I have a machine that says win prize A and I have to look down at a table which is sitting on the machine which says prize A is $500, prize B is $100, that's not a predetermined result, prize A? MS. CANDIDO. No, as it's used in the claims of the patent, a predetermined result is when the result itself is visible to the player in the segment. So $50, five tickets. MR. KAYE. My example would be the player would look at the segment and see prize A, which wouldn't be $500 until I looked down and I saw on the table that it said $500. MS. CANDIDO. Oh, I understand. MR. KAYE. Are you saying that that is a patentable distinction from a segment that's marked $500? MS. CANDIDO. I think I might be misunderstanding, Your Honor, but our position is that in any one segment, if the result was clear, whether it said $50, it might say car, it could say win prize A, any of those things would suffice. MR. KAYE. It's the win prize A and then in order to determine what prize you've won, you have to consult something else. In my example, a table which says prize A is $500. Are you saying that that renders my hypothetical not a predetermined result and therefore patentably distinct from a predetermined result? MS. CANDIDO. No. Your example would be a predetermined result. It's not so much about having to look for translation of the amount in the segment. It's that one segment tells you the complete result. You don't need to combine. You don't have to, for example, line up prize A in four different wheels. You're only looking at one segment on one wheel. And IGT's expert, in the other case, opined that this distinction is an important distinction. The IGT's expert stated, quote, display of the actual payout amounts on the wheel heightens the player's anticipation and excitement during the bonus phase because possible win amounts are immediately understandable by the player without need to refer to a payout table on the machine. And there's other testimony in the record that the player is watching the wheel spin and has that moment of anticipation. MR. KESSLER. Without needing to consult a payout table? Was that the last portion? MS. CANDIDO. That was the last. MR. KESSLER. That was my example. So your expert is distinguishing between my example and your machine, right? MS. CANDIDO. Well, that is IGT's expert. MR. KESSLER. Okay. All right. MS. CANDIDO. But yes, I think that the focus in that case was that having the numbers in the wheel, but I do think as well that having the one place where you can look for the result. For example, in the patent there's a jackpot. The jackpot doesn't tell you immediately what the dollar amount is, but there's a meter right next to it that does tell you what the amount is. And so the player, ordinarily playing the game, walks up to it, sees this jackpot amount and may sort of say to themselves, oh, you know, $100,000. And then as they're that needle is approaching the line where that jackpot slice is, they have that anticipation of, am I going to land there? Oh, that kind of hesitation moment if you've ever seen sort of a wheel spin on the Price is Right or the Wheel of Fortune TV show, it has that element. And that's what they were trying to capture by claiming specifically a predetermined result. And again, that distinction is evident in the claim language where in claims 1 through 20, they just claim a predetermined segment. And then in the claims 21 and 22, it's specific to a selected segment to indicate a predetermined result indicated by said selected segment. Isn't it sufficient that the Faye reference shows a result, doesn't use a table? The Faye, sorry. Wouldn't that be sufficient even if the other references may have some deficiency? The Faye reference was not cited in the briefing by the parties below. And so Bally did not have an opportunity to address the gains in the Faye reference that the court relied upon in its opinion. So under this court's precedent in E. Onnett, Massey, and Cooper, it was improper for the court to rely on that evidence. And Bally did not have an opportunity to address it. Turning back to the result element, it's important to remember, of course, that because the claims use the phrase predetermined segment in some claims and predetermined result in other claims, there's a presumption that there's a difference in claim scope. Similarly, the fact that claims 21 and 22 use both the term segment and result in the same element, the court, as this court found in Board of Regents versus Ben Q, those terms must be presumed to have a different meaning. And when you try to determine what is that meaning, the specification is helpful in that regard. In particular, at lines, column 10, lines 58 to 65, the 916 patent states, quote, the motor turns the wheel three segments clockwise. The game then modifies the score or alters game conditions based upon the result, displayed by that end segment. For example, suppose the end segment displayed five tickets, five points would then be added to the game score displayed on game score display. If the result bankrupt were displayed, the game score would be reset to zero. So the distinction there is between what is going to happen in the outcome of the game versus just the physical segment divider. As well, turning to the segment detector element, it's, as Bally has set forth in its briefs, IGT has not met its burden to show by clear and convincing evidence that the Topsy-Turvy game in public use had the required segment detector. And in response to your question earlier, tellness also does not provide the required segment detector, because tellness is not a wheel with segments radiating from the axis of rotation in the way that's described in the 916 patent. It's a traditional slot machine wheel that just has a real tape around the outside and various symbols that are not separated by lines or demarcated in any way. And the 916 patent expressly distinguishes between segments and the indicia that are in the segments. The patent says the specification is provided with a number of segments radiating from the axis of rotation, which are associated with at least two different indicia. So the indicia, the symbols that are on the reels are different than the radiating segments. So tellness does not provide that. In addition, tellness does not have the ability to detect even every indicia on the wheel. It has a stop notch to stop at every indicia, but it only has fewer index slots that are used by the optical detector to detect the segments as it's rotating. Thank you. Okay. Thank you, Ms. Candido. Mr. Sarles, before you start, just to clarify the question of the extended confidentiality, we're not pressing you to abandon confidentiality for things that really warrant it. We did notice that there are many markings of confidentiality. And from what you said, I gather that there are perhaps varying degrees. If you can tell us now just to ignore them, and of course, we're thinking about writing the opinion, we can do so. But if you would prefer to go through and retreat, perhaps remark, that would be acceptable. No, we'll withdraw any concerns about confidentiality. Okay. So as far as this case is concerned, then you both are withdrawing from your briefs the markings of confidentiality. As far as we're concerned, that's fine. Okay. Thank you. Good morning, Your Honor. May it please the Court. Our primary argument on this appeal is that both the segment detector and predetermined result limitations of the 916 patent were in the prior art topsy-turvy machine. We've got alternative arguments based on combinations with Telness and references in the Fay Treatise. We don't think the Court needs to reach those because it's so clear that both elements were found in the topsy-turvy. I'd like to start with the segment detector because I would suggest that it's going to be rare where you're going to have a so-called disputed issue of fact where there is so much evidence and all on one side of the line. We have four fact witnesses who testified that the topsy-turvy had a segment detector and explained how it worked. And these guys were no slouches. One of them wrote the source code for the topsy-turvy. One of them drafted the assembly drawings. One of them designed the topsy-turvy game. And one of them was vice president of marketing when the topsy-turvy was developed and sold to the Circus Circus Casino. Now, Bailey suggests that, well, maybe they're talking about some other machine other than the one that was displayed at Circus Circus. But there's no countervailing evidence and the documentary corroboration is enormous. We've got the engineering requests. We've got assembly drawings. We've got the source code. We've got a log identifying changes made to the topsy-turvy from the parent Stepper mini Bertha machine. We've got the software modification request to the gaming board. We've got the gaming board's approval. We've got the game designer's power sheet which lists probabilities. And we have IDT sales records recording the sales to Circus Circus. Now, you might wonder, well, gee, are all these documents just sort of freestanding or unrelated? But in fact, they're all inextricably linked by identifying numbers. The same sales order number, 64420, is on the engineering requests and the sales records, and both say Circus Circus Reno. The same program number, 0090, is on the sales records, the source code, the board submission, and the board approval. Can you clarify something for me because there were some materials that were, I guess it was the safari declaration exhibits that were left out of the joint appendix, specifically some of the source code. Help me out with the distinction between SS101I.ASM and SS101S.ASM. I don't know that I can help you out with that. I mean, that's an issue that was raised in the reply brief, I believe, as to the question of whether the source code was really not the same. Well, Mr. Safari explains in his declaration that all those SS101 source code items that he's talking about are related to the program number 0090. And that program number is the same one that's on the sales records of the sale of the topsy-turvy to Circus Circus. And it's also on the source code, it's on the board submission, and the board approval. So what he was dealing with was the topsy-turvy source code, and he explains how the segment detector worked and how the source code sort of instructed the segment detector how to work. The variations that they point to do not line up with his declaration, and so I would refer you to that for the details, but he does explain how the segment detector works there. You know, I would also note that the engineering requests that were prepared by the topsy-turvy designer had the exact same modifications that were in the change log and the board submission. They all talk about, you know, turning what had been a coin-operated machine, the parent machine, into a special free play promotional game for the casino in which, for example, a bell rings for exactly 15 seconds after a win until the next game, and there's meters that count the number of times that payouts are won. And if you look at the dates of these documents, they form a trail, one right after the other, beginning with the engineering requests and leading up to the installation at Circus Circus. So, you know, the question is could a reasonable jury find that the topsy-turvy lacked a segment detector? Well, the answer is plainly no because it would have to find that all this testimony from these four witnesses who were very involved with the development of the topsy-turvy and all this documentation somehow referred to some other machine for which there is no evidence in the record. And any such finding would be plainly unreasonable. I'd like to turn to this predetermined result. Let me first mention that we do have alternative argument that, as far as the segment detector, that even if it wasn't in the topsy-turvy, it was clearly in the TELNIS patent which discloses a segment detector and has, offers an embodiment in a figure and says that it detects all real positions. So what we're saying is that even if it wasn't in the topsy-turvy it would have been obvious to take the real segment detector in the TELNIS patent and combine it with a real machine like topsy-turvy. The TELNIS patent does say that there are, there's a position detector that detects all positions with regard to all segments, but figure three seems to indicate fewer than the number of openings necessary to correspond to each segment. Can you clarify that for me? Yeah, I mean the TELNIS specification says that it does detect all, I should say. This is one embodiment and it's, the way I see it, you know, there's indicia on the real, five indicia, but they're only drawn on the top of the real. And I see them as exemplary, that the reader is supposed to understand that the indicia would continue around the real. I mean after- But even given that, the problem is that there are only a few openings 21 shown and the openings 21 don't correspond, it seems to me, to the number of segments. Well, again, I think this is meant to be exemplary. It doesn't explain exactly how it works because the focus of the TELNIS patent is on this virtual mapping system, not so much on the mechanics. But by sort of displaying this one embodiment, it's saying that what's disclosed in the specification, there are ways to make it happen, whether it's through these openings on an index wheel, whether it's through notches, you know, or whatever. So I guess your argument is that the draftman didn't do that because the specification has more than enough. That's exactly right. And again, this is an alternative argument if it's not in the topsy-turvy itself. I'd like to turn to the predetermined result question. You know, this is different. Let me see if I understand. Just one more on segment detector. Sure. Let me see if I understand your argument. Are you suggesting that it doesn't really matter how many notches or holes and so forth for the optical detector there might be since presumably you could calculate the location of each segment with one notch and other input such as the speed of the turn of the wheel? Yes. There's probably ways of doing it if you could detect it. Yeah. You know, there are different ways that the segment could be detected. This one embodiment suggests that you might do it with openings on the index wheel. You know, there are other ways we know that you can do it with notches, with barcodes that have been suggested. There's a variety of ways of accomplishing this. And this figure three is not meant to be sort of the universe of possible ways. You know, this is a, TELNUS has a means plus function claim. And this is a structure that was found to be sufficient because it's a way of telling the reader that this is one type of structure that could be used to detect the positions of the reel. And it could well be, as you suggest, that if you detect one that through the microprocessor you might be able to detect them all. And so it may well work like that as well. On the predetermined result question, that's different because it's not so much a fact or evidentiary dispute between the parties as I understand Bailey's position. They're really disputing the district court's claim construction without having appealed from the Markman order. The district court construed predetermined result in method claims 21 and 22 according to its plain meaning. A result determined at some point before the indicator enters a stationary mode. And the topsy-turvy plainly satisfied that. Every spin of the wheel resulted in a predetermined way through a random number generator and a microprocessor with a pointer pointing to a segment with a symbol or a color on that segment. And that's the predetermined result of that spin. Bailey doesn't really dispute that that's how the topsy-turvy worked. Instead, it tries to reconstrue predetermined result to mean predetermined game outcome. But the claim doesn't say game outcome and the district court didn't construe it to mean game outcome. And Bailey, as I said, has an appeal from the Markman order. What Bailey says is that the district court implicitly construed predetermined result to mean game outcome. And the district court expressly rejected that contention on footnote six of its opinion, explaining that merely because a predetermined result is distinct from a predetermined segment, that doesn't mean that result means game outcome. And the court was right because Bailey's construction would be inconsistent with the very passage from the specification that Ms. Candido read to you. It says the game can modify a score, which is a game outcome, or can alter game conditions based on the result displayed by the segment. So, you know, this result displayed by the segment, that shows that a result can mean less than a game outcome. But how does this issue support the district court's decision? It supports the district court's decision because Bailey argues that the topsy-turvy didn't display a game outcome at the end of each spin, but only some sort of intermediate result that wouldn't constitute a real result under their construction, a game outcome. In fact, if you look at embodiments in the 916 patent, it shows, for example, wheel segments labeled lose a ball. Well, lose a ball is not a game outcome. It's an intermediate result, and yet it's nevertheless a result, and therefore fits well within the claim language. Furthermore, Bailey's own reply brief at page nine recognizes this point, perhaps unintentionally. It says that a final score in a 916 embodiment is, quote, the accumulation of numerous results. And I think that's exactly right. You know, there are many results that go to make up a final game outcome, and it doesn't mean that every result has to be a final game outcome. Now, we say, though, Your Honor, that even if it did mean final game outcome, the topsy-turvy satisfied that because the last wheel that stopped spinning, whatever it shows is gonna tell the player what the final game outcome is. And I can't resist a baseball analogy here. If I'm at the plate and I hit the ball safely and I reach second base, well, the result of my at-bat is a double. It doesn't matter whether it's a game outcome or not. It can be a game outcome if it knocks in the winning run in the bottom of the ninth, but it doesn't have to be, and it's the same with the topsy-turvy. Every spin gives you a predetermined result. In some situations, it might be a game outcome, but it certainly doesn't have to be according to the claim language. Now, we have alternative arguments here, too, one that it would be obvious to combine the topsy-turvy with the predetermined result that's disclosed by the Telmase patent. I don't think there's any dispute that the Telmase patent works by using a random number generator and a microprocessor to predetermine where the wheels, or in that case, the reel stops. And Mr. Safaree testified when the district court found that the topsy-turvy incorporated the Telmase method, but if the court were to find otherwise, we think it would have been obvious to combine this predetermined result method that Telmase used on the wheels. But your opponent has agreed with that. I'm sorry? That's not an issue, right? It's a prior art that the combination is obvious. Well, I think they would disagree that it would have been obvious to combine the two, Your Honor. Now, we have a second alternative argument that applies only if the court agrees with Bally that predetermined result means predetermined game outcome, and if it finds that it's not in the topsy-turvy. In that case, we say that it would have been obvious to combine the predetermined result in Telmase with the wheel game outcomes that are shown on some of the games displayed in the Faye Treatise. Now, Bally argues that the district court might have referred to a different edition or a different page from the Faye Treatise than was in our briefs, but if you look at our summer judgment briefing, there's no question but that we disclosed the Faye Treatise with respect to this very predetermined result limitation of claim 21. If there was a glitch in the page number or the edition, it's not material because the exact same machines were shown in both editions. Ms. Candido argues that they didn't have an opportunity to reply with respect to the Faye reference and that that reference should not be considered. Well, we don't agree because, as I said, our summary judgment briefing did disclose the Faye reference with regard to this claim and this element. They had an opportunity to respond to that. The idea that they weren't on notice, it's just wrong because everybody in this industry and all the lawyers involved are very familiar with this Faye Treatise because it's got these beautiful pictures of these old historical machines and we disclosed the Shaw, Illinois machine that has the final game outcomes displayed. So in our view, remember this is a second alternative argument on our part that we don't think the court needs to reach. But if you do, we don't think there's any merit to the idea that they were blindsided. Thank you. Thank you, Mr. Sarles. Ms. Candido. Excuse me, Mr. Sarles makes reference to IGT's fact witnesses with respect to corroboration of the segment detector element. And it's important to recognize IGT's fact witnesses are all IGT employees, most of them for over 20 years. One was a member of the board of directors I think two of them were vice presidents of IGT. One of them made over $2 million in stock options from IGT. These are biased, interested witnesses. In addition, our briefs make it very clear about the testimony of these witnesses that they lack personal knowledge of the Topsy-Turvy. They never saw the, except for Mr. Safari, they never saw the inside of the game. They only saw it operate once on a casino floor. And in addition, 17 years elapsed between the period of time when these witnesses would have seen the game and the time that they provided their declarations. There are significant credibility issues here that should have been addressed by a jury, not by the court, consistent with this court's precedent in typewrite and in juicy whip. In addition, IGT says that they have source code and they do have source code and they have lots of evidence with respect to Topsy-Turvy purchase orders and engineering reports, all the stuff that Mr. Sarles mentioned. Let me go back if I can, to make sure I understand your position on the credibility. Are you saying that if one party puts in evidence, the other party can come in and say that evidence, there is credibility, there are credibility problems with that evidence, not put in any evidence, contrary evidence, but just say that we think that we could impeach those witnesses, that that's enough to defeat summary judgment in every case? No, I don't know that that alone would be sufficient to defeat summary judgment. I think the cases like juicy whip look at a multitude of factors. I think there's about eight. And those factors do include the amount of time that's elapsed, whether they're interested, the level of their knowledge, the certainty of their testimony. Well, again, those are all questions going to impeachment. Yes. But my question really is, does the non-moving party have to put in some kind of affirmative evidence itself or could it simply say there are credibility issues with the evidence put in by the other side? Well, obviously, Bally can't put in evidence about IGT's game, but we did raise evidentiary issues about what their documentation shows, the corroboration issues. And our point is that they do have a lot of documentation about Topsy-Turvy being sold and we don't dispute that it was sold, it existed. The issue that's important for this appeal is did it perform segment detection? And that is specific to the source code that's specific to segment detection, the two files that Your Honor mentioned, the SS-101 files. And we emphasize that there is no correlation between those source code files and the Topsy-Turvy. It is tenuous at best. There are numerous IGT games referred to as S-slot games. IGT says that's what SS is referring to in this context. But again, because there are multiple SS S-slot games, there's no reason why that code is not a code from Topsy-Turvy as opposed to one of another multitude of games. And Mr. Starles also mentioned that there are changes that were made in Topsy-Turvy that are reflected in the code, but there are additional changes that IGT says were made in Topsy-Turvy that are not reflected in the code. So we have a sort of rife with inconsistencies with respect to whether this code is the right code for the Topsy-Turvy game. And for that reason, combined with the fact that IGT has to rely on these witnesses that are interested and do have serious credibility issues, that combined makes this corroboration issue a question for the jury, consistent with juicy whip and type right. Okay, so it wasn't questioned that the code, which actually was an evidence, did show the segments. You're questioning the bonafides of the code that was an evidence. Correct. The question is not whether the SS files show segment detection, it's whether that is actually the source code for the Topsy-Turvy game. And that was produced separately from the gaming submission that IGT says it was attached to. There are numerous questions with respect to that. It doesn't talk about the main change, which was changing reels into wheels in the gaming submission and in the code. So we really have to question whether that is the right code for this game. And we believe there are significant questions in that regard. And briefly, with respect to Telmis, Telmis detects angular positions, not indicia, not stop positions. It says essentially, I'm at 30 degrees, I'm at 60 degrees, I'm at 100 degrees. Doesn't that tell you the stop position? Well, it tells you, not if you're not lined up between the stops. If I have a compass that's going around and I'm told, well, I'm at 90 degrees, well, I know I'm east. I know that's east. If I'm at 180 degrees, I'm south. Yes. Isn't it the same thing? Well, the important distinction here is that between, let's say, 90 degrees and 180 degrees, there may be four or five stop positions. Right, and if I know the angle, I know the name of that particular point in the compass. Well, as we pointed out in the file history for this patent, it's important in gaming to avoid fraud, of course, and issues about landing on the wrong segment or someone trying to hold the wheel and keep it in one place despite the motor going so it lands in the wrong spot. And this segment detection enables the machine to know with certainty that it is at each segment. Whereas if you're only detecting with certainty, let's say, zero degrees and 180 degrees, you don't know if between zero degrees and 180 degrees, there's been slippage, there's been interference, intentionally or otherwise. And experts have explained dust accumulates. Static electricity of casino floors can build up across the carpet and cause these things not to function the way that they should. And what's an important distinction of this invention is that it knows with certainty where each segment is. Thank you. Thank you, Ms. Candido, and thank you, Mr. Sarles, on this case.